IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHAEL JOHNSON,                    )
                                   )
            Plaintiff,             )
                                   )
     v.                            )        No. 1:25-cv-00417
                                   )
INDIANA DEPARTMENT OF              )
CORRECTION,                        )
                                   )
            Defendant.             )

## COMPLAINT FOR DAMAGES

**Introductory Statement**

1.      Michael Johnson is deaf.  For approximately twenty-two months, he was incarcerated at the Plainfield Correctional Facility ("Plainfield"), an adult prison operated by the Indiana Department of Correction ("DOC").  Despite the fact that his disability is obvious to anyone who interacts with him, and despite numerous requests submitted through a wide variety of channels, staff at Plainfield steadfastly failed to provide him with an American Sign Language interpreter or other forms of simple accommodations that would have allowed Mr. Johnson to meaningfully participate in prison life.  As a result of these failures, for almost two years Mr. Johnson was not able to make telephone calls to friends or family, participate in programming at the facility available to other inmates, or meaningfully attend religious services.  Indeed, because certain announcements at Plainfield were made orally, he was regularly unable to attend recreation, to retrieve medications

prescribed by facility staff, and even to eat.   The DOC's prolonged failure to accommodate Mr. Johnson's disability violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.   Mr. Johnson is entitled to his damages.

**Jurisdiction, Venue, and Cause of Action**

2.    This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

3.    Venue is proper in this district pursuant to 28 U.S.C. §1391.

4.    Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and by 28 U.S.C §§ 2201 and 2202.

5.    The plaintiff's claims are brought pursuant to the Rehabilitation Act, 29 U.S.C § 794a.

**Parties**

6.    Michael Johnson is an adult resident of Putnam County, Indiana.

7.    The Indiana Department of Correction is the state agency responsible for overseeing the incarceration of many persons convicted of criminal offenses in Indiana.

**Factual Allegations**

### *Michael Johnson's incarceration at Plainfield Correctional Facility*

8.    Michael Johnson is deaf.   He has had very little ability to hear since at least his very early childhood, and in his adulthood his ability to hear deteriorated further such that he became "fully" deaf.

9.    Mr. Johnson is therefore a "qualified individual with a disability" as that term is utilized in 29 U.S.C. § 794(a).

10.     In December 2022, Mr. Johnson was sentenced to a term of incarceration following his conviction for criminal offenses.  He was transferred from a county jail to the Indiana Department of Correction ("DOC") in January 2023 and was placed in the Plainfield Correctional Facility ("Plainfield")—a prison operated by the DOC—in or around late February of 2023.

11.     Mr. Johnson was incarcerated at Plainfield from late February of 2023 until his release from the DOC on or about December 26, 2024.  Mr. Johnson is not currently incarcerated but remains on home detention.

### *Mr. Johnson's inability to participate in prison life due to his disability*

12.     During the 22 months that he spent incarcerated at Plainfield, Mr. Johnson was not able to meaningfully participate in numerous aspects of prison life due exclusively to the fact that he is deaf.

### a.     Phone Calls

13.     A telephone is available at Plainfield that inmates may utilize to place phone calls to friends, family members, or other persons.  That telephone, however, did not have any special telecommunications equipment—such as a teletypewriter (TTY)—to allow for its use by Mr. Johnson or other persons with a hearing impairment.

14.     As a result, Mr. Johnson was not able to utilize the telephone available to other inmates at Plainfield to maintain contact with his friends or family members.

15.     Throughout his entire incarceration at Plainfield, he only received in-person visits from two persons, although even these visits were sporadic as persons were only allowed to visit inmates at Plainfield for a period of one hour every fourteen days.

16.    Had he been able to utilize the telephone, Mr. Johnson would have called his mother virtually every day.  His inability to do so deprived him of the ability to maintain meaningful, fulfilling contact with his mother, or anyone else, during his period of incarceration.

b.    <u>Programming</u>

17.    At the time that he was sentenced for his criminal offenses, the sentencing court "recommended" that he take substance abuse classes while incarcerated.

18.    Mr. Johnson very much wanted to take these classes as he believed they would help his rehabilitation and his ability to function without engaging in unlawful activity once he was released from prison.

19.    These classes were offered at Plainfield and Mr. Johnson therefore enrolled in the classes beginning in mid-2023.

20.    The classes were conducted orally by an instructor at Plainfield but Mr. Johnson was not provided with an American Sign Language ("ASL") interpreter or with any other means for him to understand or participate in the classes.

21.    After a small number of classes, the instructor confirmed that Mr. Johnson had no idea what was happening in the class and was not able to participate in it because he was not able to hear.  Then, rather than ensure that Mr. Johnson *was* able to participate, the instructor simply decided to "graduate" Mr. Johnson from the class early.  As such, Mr. Johnson was unable to benefit from the content of the class.

22.    During his incarceration at Plainfield, Mr. Johnson also attended additional programming offered at the facility, such as a fatherhood class and an anger

management class. Again, he believed that these classes would assist with his rehabilitation and better prepare him for life after he was released. For these classes, too, the facility did not provide Mr. Johnson with an ASL interpreter and he was therefore not able to understand or meaningfully participate in these classes.

c.    Religious Services

23.    Inmates at Plainfield, like inmates at other DOC facilities, are generally allowed to participate in congregate religious services, consistent with their faith, at least once a week.

24.    Mr. Johnson is a Christian and, consistent with his faith, desired to attend and participate in religious services at least weekly. These services, however, were conducted orally by the facility's chaplain, and Mr. Johnson was not provided with an ASL interpreter or with any other means for him to understand or participate in the services.

25.    Mr. Johnson therefore only attended religious services for a short period of time in mid-2023. He rapidly determined that continuing to attend services was pointless insofar as he could not hear what was being said, and he therefore ceased attending services. He would have continued attending services, however, if he was offered a way to participate in the services.

d.    Meals, Recreation, and Medication

26.    Barring atypical circumstances such as a facility lockdown, each day during Mr. Johnson's incarceration at Plainfield inmates in general population were offered three meals, an hour of recreation, and the ability to receive any medications that

had been prescribed for them (known colloquially as "med line" or "med pass").

27.    These activities required that inmates travel away from their housing unit. Therefore, they were announced simply through a correctional officer opening the door to the housing unit and yelling to inform inmates on the unit of the applicable movement.

28.    For instance, at meal time, an officer would open the door to Mr. Johnson's housing unit and yell, "Chow going out!"  Similarly, when it was time for inmates to receive their medications, an officer would open the door to the housing unit and yell, "Med line going out!"

29.    Facility staff delivered these messages orally and, as such, Mr. Johnson was unable to hear them.  Sometimes he was able to discern, through the movements of other inmates, that it was time for a meal, for recreation, or for med pass.  Other times another inmate might inform him of the applicable activities.

30.    Unfortunately, neither of these methods reliably ensured that Mr. Johnson was informed that it was time for these activities and, because he could not hear the announcements made by staff at Plainfield, he frequently missed meals and recreation and failed to take prescribed medications.

31.    For instance, breakfast at Plainfield was served early in the morning— sometimes as early as 3:30am.  Mr. Johnson missed this meal almost every day because he was asleep at the time and he could not hear the oral announcement by staff at the facility, which would wake inmates who were not deaf.  On occasion, Mr. Johnson would stay awake through the night in order to ensure that he did not miss

6

breakfast but this usually resulted in him falling asleep later in the day and missing dinner.

32.     As a result of not hearing announcements regarding meal time, and therefore missing meals, Mr. Johnson lost fifty or sixty pounds during the period of his incarceration at Plainfield.

33.     Because he routinely missed meals, Mr. Johnson often was painfully hungry. On occasion, he attempted to supplement his meals through commissary—through the purchase of multivitamins or other items—although items on commissary were expensive and he therefore did not do this with great frequency.

34.     To receive prescription medications at Plainfield, inmates were required to travel to a different area of the facility during med pass.  While incarcerated, Mr. Johnson suffered from diagnosed depression and was therefore prescribed antidepressants that he was supposed to take daily.

35.     However, as he could not hear oral announcements for med pass, he did not receive these medications as prescribed but instead only received them, on average, a couple of times a week.  This led to the medications having only minimal benefit and caused him to suffer unnecessarily.

### *Mr. Johnson's unsuccessful attempts to obtain accommodations for his disability*

36.     Since shortly after his transfer to Plainfield in early 2023, Mr. Johnson's deafness was well known to staff at that facility, and it was obvious to anyone who interacted with him.

37.     Although it should not have been necessary insofar as his need for

accommodation was obvious, throughout his time at Plainfield, Mr. Johnson repeatedly asked staff at the facility for assistance so that he could meaningfully participate in the programs or activities noted above.  He specifically requested the installation of a TTY telephone to enable him to make phone calls; an ASL interpreter to enable him to participate in programming and religious services; and a vibrating alarm clock (worn as a watch) that would notify him when it was time for meals, recreation, and med pass.

38.    These requests were made to correctional officers (and supervising officers) with whom Mr. Johnson interacted regularly, to Mr. Johnson's assigned case workers, to the "dorm managers" responsible for overseeing the units in which Mr. Johnson was housed, to medical staff at the facility, and to the DOC employee identified to him as specifically responsible for ensuring that inmates with disabilities were accommodated at the facility.  When he was unable to participate in programs specifically overseen by DOC employees—such as substance abuse classes and religious programming—he requested accommodations from these persons as well.  And when none of his attempts to obtain accommodations for his disability were successful, Mr. Johnson attempted to obtain these accommodations through the DOC's grievance system.

39.    The precise response by facility staff to Mr. Johnson's requests varied.  Sometimes he was told simply that "this is prison" or that his disability was "not [staff's] problem."  Other times, when a request for accommodation was made in writing, he did not receive a response at all.  And other times he was provided vague

assurances that staff was looking into the matter or that he might be provided an accommodation at some unspecified point in the future.

40. Despite the fact that he spent nearly two years incarcerated at Plainfield, this unspecified point never happened and he never received any sort of meaningful accommodation capable of enabling his participation in the programs or activities noted above.

41. The closest that Plainfield came to meaningfully attempting to accommodate Mr. Johnson's disability happened in or around June 2023—after Mr. Johnson had already been incarcerated for several months—when a TTY telephone was brought into the facility in an attempt to enable Mr. Johnson to place telephone calls to his friends or family members.   Unfortunately, Mr. Johnson was informed shortly thereafter that this TTY telephone was not compatible with Plainfield's "system" and that telephone was therefore never installed or made available to Mr. Johnson.  While Mr. Johnson does not know what, if any, attempts were made to fix this issue or to come up with an alternative accommodation that would allow him to utilize the telephone, he does know that he was not able to utilize the telephone for the rest of his incarceration—another eighteen months.

42. At one point, Plainfield also installed a "video relay system" device on the kiosk available in one of the units in which he was briefly housed (although it did not attempt to provide a similar accommodation in any other unit in which he was housed).  When it worked properly, this device was intended to allow Mr. Johnson to place phone calls and communicate using ASL.  However, the device stopped working

after he had used it only two or three times.  While a brief attempt was made to repair the device, it was never repaired and never regained functionality, and staff thereafter stopped responding to Mr. Johnson's complaints regarding the functionality of this device.

43.     In mid-2024, after he had been incarcerated at Plainfield for more than a year without receiving any meaningful accommodations for his disability, Mr. Johnson submitted a complaint to the DOC Ombudsman, the independent state entity responsible for investigating inmate complaints about the DOC.

44.     It is Mr. Johnson's understanding that, as a result of this complaint, the DOC Ombudsman caused an "ADA audit" to take place at Plainfield.  During and in the immediate aftermath of this audit, Mr. Johnson received vague assurances from facility staff that his requests for accommodations would be "reevaluated" and that any findings from the audit would be "scrutinized."  What he did not receive for the rest of his incarceration, however, was any accommodation capable of enabling him to meaningfully participate in the programs and activities noted above.

45.     The DOC's failure to reasonably accommodate Mr. Johnson's disability was not justified by any security or other penological interest, and accommodating his disability would not have resulted in a fundamental alteration of the DOC's programs or activities.

46.     On information and belief, the DOC routinely houses inmates who are deaf or whose hearing is significantly impaired, and such inmates have been incarcerated at Plainfield in the past.  In fact, the Centers for Disease Control and Prevention

estimates that 13.0% of adults experience some difficulty hearing while 1.6% experience a lot of difficulty hearing or cannot hear.  *See* Jennifer H. Madans, Ph.D., et al., NCHS Data Brief, *Hearing Difficulties Among Adults: United States, 2019*, at 1-2 (July 2021), available at https://www.cdc.gov/nchs/data/databriefs/db414-H.pdf (last visited Mar. 2, 2025).  Among inmates, these figures are substantially higher: in 2016, nearly ten percent of state and federal inmates reported being "deaf" or having "serious difficulty hearing."  *See* Laura M. Maruschak, et al., U.S. Dep't of Justice, Bureau of Justice Statistics, *Disabilities Reported by Prisoners*, at 6 (Mar. 2021), available at https://bjs.ojp.gov/content/pub/pdf/drpspi16st.pdf (last visited Mar. 2, 2025).

47.    Given all this, Mr. Johnson does not know why the DOC did not already have established procedures or readily available accommodations to enable him to meaningfully participate in the programs or activities noted above.

48.    The failure to ensure that Mr. Johnson had prompt access to these accommodations (let alone access at any point during his 22-month incarceration at Plainfield) constituted more than mere negligence by the DOC.  Rather, it constituted intentional discrimination and deliberate indifference—both to Mr. Johnson's disability-related needs and to the DOC's obligations under the Rehabilitation Act of 1973—and Mr. Johnson is therefore entitled to his damages.

### *Concluding factual allegations*

49.    At all relevant times, the DOC has been a recipient of federal financial assistance, and is therefore subject to the requirements of the Rehabilitation Act of

1973, 29 U.S.C. § 794.

50.    As a result of the actions or inactions of the DOC, Mr. Johnson has suffered damages.

**Legal Claim**

51.    The failure to provide the plaintiff with reasonable accommodations for his disability, so that he can fully participate in the programs and services at Plainfield Correctional Facility, violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the defendant is liable for this violation.

**Request for Relief**

**WHEREFORE,** the plaintiff respectfully requests that this Court do the following:

a. Accept jurisdiction of this cause and set it for hearing.

b. Declare that the defendant has violated the plaintiff's rights for the reason noted above.

c. Award the plaintiff his damages, including both nominal and compensatory damages.

d. Award the plaintiff his costs and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a and all other applicable statutes.

e. Award all other proper relief.

Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
grose@aclu-in.org

*Attorney for the plaintiff*